# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

LEONARD W. HILL,

    Petitioner,

v.

BRIAN WILLIAMS, et al.,

    Respondents.

Case No.: 2:17-cv-00155-APG-VCF

**Order**

    Leonard W. Hill, a Nevada prisoner, filed a counseled petition for writ of habeas corpus under 28 U.S.C. § 2254.  I deny Hill's habeas petition, deny him a certificate of appealability, and direct the Clerk of the Court to enter judgment accordingly.

## I.    BACKGROUND

    Hill's convictions are the result of events that occurred in Clark County, Nevada about December 12, 2005. ECF No. 33-5.  In its order affirming Hill's conviction, the Supreme Court of Nevada described the crime, as revealed by the evidence at Hill's trial, as follows:

> In the morning hours of December 12, 2005, the Las Vegas Metropolitan Police Department (LVMPD) was called to the shared apartment of appellant Leonard W. Hill and Robin Martin for a domestic disturbance.  After defusing the situation by escorting Hill and Martin into separate rooms and determining that neither party posed a danger to the other, the LVMPD left the apartment.  Several hours later, a neighbor called the LVMPD upon hearing loud noises coming from the apartment.  Subsequently, the LVMPD entered the apartment and found Martin on the floor.  Martin was not breathing and was later pronounced dead.  A Clark County medical examiner later determined that Martin's death was a homicide as a result of strangulation.

ECF No. 28-3 at 2.

Following a jury trial, Hill was convicted of first-degree murder and sentenced to life in prison with a minimum parole eligibility of 20 years. ECF Nos. 33-18, 33-21.  Hill appealed, and the Supreme Court of Nevada reversed and remanded on February 29, 2008, determining that some expert testimony was erroneously admitted and there were several instances of prosecutorial misconduct. ECF No. 33-35.  A second jury trial was held, and Hill was again found guilty of first-degree murder. ECF No. 27-9.  The state district court again sentenced Hill to life in prison with a minimum parole eligibility of 20 years. ECF No. 34-16.  Hill appealed, and the Supreme Court of Nevada affirmed on May 27, 2011. ECF No. 28-3.  Remittitur issued on June 21, 2011. ECF No. 34-33.

Hill's pro se state habeas petition and counseled supplemental petition were filed on April 26, 2012 and May 28, 2014, respectively. ECF Nos. 28-4, 28-5.  The state district court denied the petition on February 20, 2015. ECF No. 28-7.  Hill appealed, and the Supreme Court of Nevada affirmed on November 17, 2016. ECF No. 28-9.  Remittitur issued on December 14, 2016. ECF No. 35-32.

Hill's pro se federal habeas petition and counseled first amended petition were filed on August 14, 2017 and April 27, 2018, respectively. ECF Nos. 8, 21.  The respondents moved to dismiss the amended petition on October 22, 2018. ECF No. 32.  I granted the motion in part, finding that Ground 1 and the claims in Ground 5 (that the State disparaged defense counsel) were unexhausted. ECF No. 44.  Hill moved for the dismissal of Ground 1 and the partial dismissal of Ground 5. ECF No. 45. I granted the motion. ECF No. 46.  The respondents answered the remaining grounds in Hill's first amended petition on December 2, 2019, and Hill replied on February 14, 2020. ECF Nos. 50, 53.

In his remaining grounds for relief, Hill alleges the following violations of his federal constitutional rights:

| | |
|---|---|
| 2. | The state district court failed to dismiss a biased juror. |
| 3(a). | The state district court denied his right to question Detective Andersen. |
| 3(b). | The state district court limited the scope of his impeachment. |
| 3(c). | The state district court improperly limited voir dire. |
| 4. | The State presented insufficient evidence. |
| 5. | The State committed prosecutorial misconduct. |
| 6. | The state district court rejected defense jury instructions. |
| 7(a). | His trial counsel failed to adequately prepare for an effective cross-examination of Dr. Olson. |
| 7(b). | His trial counsel failed to object to Linda Jones' testimony. |
| 7(c). | His trial counsel implicitly admitted guilt during voir dire. |
| 7(d). | His trial counsel failed to object to jury instructions. |
| 7(e). | His trial counsel failed to object to prosecutorial misconduct. |
| 8. | There were cumulative errors. |

ECF No. 21.

## II.    STANDARD OF REVIEW

The standard of review generally applicable in habeas corpus cases is set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that

3

1   contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court

2   confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

3   Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362,

4   405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).   A state court decision is an

5   unreasonable application of clearly established Supreme Court precedent within the meaning of

6   28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the

7   Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

8   case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).   "The 'unreasonable application' clause

9   requires the state court decision to be more than incorrect or erroneous. The state court's

10  application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*,

11  529 U.S. at 409-10) (internal citation omitted).

12         The Supreme Court has instructed that "[a] state court's determination that a claim lacks

13  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

14  correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing

15  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   The Supreme Court has stated "that even a

16  strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

17  at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)

18  (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating

19  state-court rulings, which demands that state-court decisions be given the benefit of the doubt"

20  (internal quotation marks and citations omitted)).

21  //

22  //

23  //

4

## III.    DISCUSSION

### A.    Ground 2

In Ground 2, Hill alleges that his federal constitutional rights were violated when the state district court failed to dismiss a biased juror. ECF No. 21 at 13.  Hill elaborates that Leroy Reyes, an alternate juror, had significant connections to one of the State's witnesses, Julianna Gross, and these connections created a presumptive bias against him. *Id.*  In affirming Hill's judgment of conviction, the Supreme Court of Nevada held: "Hill contends that the district court abused its discretion in . . . rejecting a for-cause challenge to an alternative juror . . . .  We have reviewed th[is] argument[ ] and conclude that [it] lack[s] merit." ECF No. 28-3 at 4 n.3.  When a state court has denied a federal constitutional claim on the merits without explanation, I must first "determine what arguments or theories supported or . . . could have supported, the state court's decision," and then I "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court."[1] *Harrington*, 562 U.S. at 102.

Following opening statements, outside the presence of the jury, the State informed the trial judge that one of its witnesses, Julianna Gross, indicated that she knew Leroy Reyes, an alternate juror. ECF No. 26-1 at 52-53; *see also* ECF No. 25-11 at 67.  The judge brought Mr. Reyes into the courtroom to evaluate whether "there's a problem." ECF No. 26-1 at 54.  Mr. Reyes explained that he knew the witness by the name Julie Perez and that she had dated his roommate "10 or 11 years ago." *Id.* at 54-55.  Mr. Reyes had not seen Ms. Gross for eight to ten years, but he spoke with her on the telephone for approximately five minutes several months

---

[1] My review of numerous grounds in Hill's amended petition is based on this two-step process described in *Harrington*, and I will not repeat it going forward.

before the trial. *Id.* at 56, 61.  Mr. Reyes had been scheduling a surgery at a doctor's office, and the person scheduling the surgery was best friends with Ms. Gross. *Id.* at 56, 59.  When that person found out through small talk that Mr. Reyes knew Ms. Gross, she called Ms. Gross and handed the telephone to Mr. Reyes. *Id.* at 56-57, 60.  Mr. Reyes also disclosed to the trial judge that he worked with Ms. Gross' mother and cousin at the Golden Nugget. *Id.* at 58-59.

In response to the judge's question about whether there was "[a]nything about [his] friendship with Ms. [Gross] that would affect [his] ability to serve as a fair and impartial juror if [Ms. Gross] was called to be a witness in this case," Mr. Reyes responded, "No." *Id.* at 61.  The judge then refused Hill's trial counsel's request that Mr. Reyes be excused. *Id.* at 62.  Mr. Reyes was not included in the jury panel that deliberated, as he was allowed to leave the courthouse following closing arguments due to his status as an alternate juror. ECF Nos. 27-7 at 86, 34-14 at 3-4.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  And "the remedy for allegations of jury partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982) (explaining that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation"). Although the trial judge did not hold a formal hearing, it thoroughly questioned Mr. Reyes about his connection with Ms. Gross. *See* ECF No. ECF No. 26-1 at 54-61.  And although Mr. Reyes knew Ms. Gross, they had an attenuated connection and, importantly, Mr. Reyes indicated that this connection would not affect his ability to be impartial. *See id.* at 61.  Further, Mr. Reyes did not partake in deliberations. *See, e.g., Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (explaining that "[a]ny claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat").

1    Fairminded jurists would agree that this reasoning establishes that Hill's federal constitutional

2    rights were not violated. *Harrington*, 562 U.S. at 102.  Hill is not entitled to relief on Ground 2.

3        **B.      Ground 3**

4            In Ground 3, Hill alleges three incidents where the trial judge denied his right to present a

5    complete defense. ECF No. 21 at 15.  "The right of an accused in a criminal trial to due process

6    is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers*

7    *v. Mississippi*, 410 U.S. 284, 294 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967)

8    (explaining that an accused "has the right to present his own witnesses to establish a defense"

9    and that "[t]his right is a fundamental element of due process of law"); *DePetris v. Kuykendall*,

10   239 F.3d 1057, 1062 (9th Cir. 2001) ("The Supreme Court has made clear that the erroneous

11   exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due

12   process right to a fair trial and the Sixth Amendment right to present a defense.").  "[T]he

13   Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a

14   complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v.*

15   *Trombetta*, 467 U.S. 479, 485 (1984)).  A defendant's opportunity to be heard "would be an

16   empty one if the State were permitted to exclude competent, reliable evidence . . . when such

17   evidence is central to the defendant's claim of innocence." *Id.*  This is because, "[i]n the absence

18   of any valid state justification, exclusion of . . . exculpatory evidence deprives a defendant of the

19   basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful

20   adversarial testing.'" *Id.* at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

21           That being said, the Supreme Court of the United States has "never questioned the power

22   of States to exclude evidence through the application of evidentiary rules that themselves serve

23   the interests of fairness and reliability—even if the defendant would prefer to see that evidence

admitted." *Crane*, 476 U.S. at 690.  In fact, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *United States v. Scheffer*, 523 U.S. 303, 308 (1998), and the Supreme Court has stated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 320 (2006); *see also Nevada v. Jackson*, 569 U.S. 505, 509 (2013) ("Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.").

### 1.    Ground 3(a)

In Ground 3(a), Hill alleges that the trial judge denied him the right to question Detective Andersen about the original lack of testing of the blood evidence—evidence that Hill argues supported his defense that the police rushed to judgment. ECF No. 21 at 15-16.  In affirming Hill's judgment of conviction, the Supreme Court of Nevada held:

> Hill contends that the district court abused its discretion in excluding Detective Anderson's testimony regarding the delay in DNA processing.  Hill argues that the district court improperly restricted his ability to present his theory of the case.  Hill also argues that he sought to examine Detective Anderson concerning her rationale for not immediately processing the DNA samples to demonstrate the inadequacy of the investigation and the insufficiency of the evidence.
>
> The decision to exclude testimony is within the sound discretion of the district court, and the court's decision will not be overturned absent manifest error. *Means v. State*, 120 Nev. 1001, 1007-08, 103 P.3d 25, 29 (2004).
>
>> Although a criminal defendant has a due process right to introduce into evidence any testimony or documentation which would tend to prove the defendant's theory of the case, that right is subject to

the rules of evidence, including the rules that evidence must be relevant, and that even relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.

*Rose v. State*, 123 Nev. 194, 205 n.18, 163 P.3d 408, 415-16 n.18 (2007) (internal citations and quotations omitted); NRS 48.035(1).

Here, we conclude that Detective Anderson's testimony about the delay in DNA processing, although relevant, would have unfairly prejudiced Hill by alerting the jury to Hill's first conviction. *See* NRS 48.035(1). Although Hill maintains that Anderson could have referred to an ambiguous "prior hearing" during her testimony, the State is entitled to rebut the testimony, which could have included a reference to Hill's prior trial and conviction. Therefore, we conclude that the district court did not abuse its discretion in excluding Detective Anderson's testimony.

ECF No. 28-3 at 4-5. The Supreme Court of Nevada's rejection of Hill's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States and was not based on an unreasonable determination of the facts.

At Hill's first trial in 2006, Detective Laura Andersen testified that she was dispatched to Hill's apartment and was assigned to inspect "the physical scene itself." ECF No. 24-1 at 127-29. Along with some blood samples from the carpet and a cordless telephone with some apparent blood on it, "a steak knife with a plastic black handle was recovered from underneath a chair in the dining room." *Id.* at 129-130. Although the knife was tested for fingerprints, "no DNA analysis" was done on the blood evidence. *Id.* at 134. Detective Andersen explained why: "DNA testing is usually for . . . unknown suspect cases or multiple suspect cases where there is a quantitative amount of blood, you're trying to identify a suspect." *Id.* at 134-35. In the case at hand, due to Hill's statements that he killed Martin, "there was not any more suspects that were

outstanding," so DNA testing "would have been redundant and . . . very time consuming, very complicated, [a] very long process." *Id.* at 135-36.

Hill's trial counsel later discussed the lack of DNA testing in his closing argument:

> Don't you think you deserve more evidence before someone seriously asks you to consider . . . convicting somebody of first degree murder or any murder for that matter? Don't you want to know whose blood was where? Testing blood for identity is that so Hollywood? Is that so futuristic that we don't expect it? . . .
>
> You know what in point of fact you should expect to have that kind of basic and elementary evidence. You should demand it. When the State is asking you to convict somebody of the harshest crime we have, let them do some basic and elementary forensic testing. You can demand that. You should demand it.

ECF No. 24-3 at 107-09.

Following the Supreme Court of Nevada's reversal of Hill's conviction and before the second trial commenced, Detective Andersen obtained a buccal swab from Hill in order to test the DNA from the blood evidence. *See* ECF No. 25-5 at 3. Later, during Hill's second trial in 2009, the State informed the trial judge that it wanted Hill's trial counsel to make an offer of proof regarding Detective Andersen. ECF No. 27-5 at 162-63. The State had previously told Hill's trial counsel that it would be calling Detective Anderson to testify at the second trial and that Hill's trial counsel did not need to subpoena her. *Id.* at 162. However, the State changed its mind, indicating that it was no longer going to be calling Detective Andersen because the DNA had since been tested and it no longer needed Detective Andersen to "explain why she didn't do [the testing] in this particular case." *Id.* at 162-63.

In response, Hill's trial counsel explained that the timing of the DNA testing was "completely relevant to a rush a judgment to them not investigating at the point and time that this happened whether or not this was self-defense." *Id.* at 166. Hill's trial counsel argued that

1  "[t]here's nothing improper" about him "saying that these DNA reports were done in 2009." *Id.*

2  at 166.  The trial judge retorted, "[e]xcept the fact that the State doesn't get to explain why they

3  were done in 2009" instead of 2006. *Id.*  The judge then ruled that Hill's trial counsel would not

4  be able to ask Detective Andersen about the timing of the DNA testing because "we can't get

5  into the fact that he was convicted and this is a retrial." *Id.* at 171.  The judge elaborated that if

6  Hill's trial counsel questioned Detective Andersen about the timing of the DNA testing, "her

7  explanation would be: He was convicted; it was overturned and we decided to retest it so that our

8  investigation wouldn't be impeached the way it was in the first trial." *Id.* at 175.  The trial judge

9  concluded that this explanation would be "totally unfair to" Hill. *Id.*

10  To be sure, this resulted in Hill's trial counsel losing the ability to argue that law

11  enforcement rushed to judgment by failing to timely test the DNA evidence.  However, even if

12  losing this argument was detrimental to Hill, it cannot be concluded that Hill's federal

13  constitutional rights were violated.  As the Supreme Court of Nevada reasonably determined,

14  asking Detective Andersen about the DNA testing would have alerted the jury that Hill was

15  previously tried and convicted.  Indeed, allowing Hill's trial counsel to question Detective

16  Andersen about the fact that the DNA testing was not completed during the initial investigation

17  would have opened the door to the State questioning Detective Andersen about the history

18  leading up to the eventual testing of the DNA to rebut any procrastination implication.

19  Therefore, the Supreme Court of Nevada reasonably concluded that evidence that Hill had been

20  previously convicted of the murder of Martin would have been unfairly prejudicial to Hill in

21  violation of Nev. Rev. Stat. § 48.035(1), which provides that "evidence is not admissible if its

22  probative value is substantially outweighed by the danger of unfair prejudice."  This ruling is

23  consistent with precedent of the Supreme Court of the United States that trial judges are allowed

1   "to exclude evidence if its probative value is outweighed by certain other factors such as unfair

2   prejudice." *Holmes*, 547 U.S. at 320.  Because the Supreme Court of Nevada reasonably denied

3   Hill's claim, he is denied federal habeas relief for Ground 3(a).

4              **2.      Ground 3(b)**

5       In Ground 3(b), Hill alleges that the trial judge improperly limited the scope of his

6   impeachment of Linda Jones, Martin's sister, by forbidding him from fully exploring the

7   underlying facts of her previous conviction. ECF No. 21 at 17.  Hill explains that he was unable

8   to fully refute Jones' credibility, which was important because her testimony undermined his

9   self-defense claim. ECF No. 53 at 14.  In affirming Hill's judgment of conviction, the Supreme

10  Court of Nevada held: "Hill contends that the district court abused its discretion in . . . excluding

11  evidence offered to impeach a prosecution witness . . . . We have reviewed th[is] argument[ ] and

12  conclude that [it] lack[s] merit." ECF No. 28-3 at 4 n.3.

13      The State called Linda Jones, Martin's younger sister, as a witness. ECF No. 26-2 at 120-

14  21.  Jones testified that she was previously the property manager at La Fiesta Apartment Homes

15  where Martin resided. *Id.* at 123-24.  Jones described Martin as being "really always calm, cool,

16  and just easy going about everything." *Id.* at 137.  Prior to the killing, Martin told Jones that

17  "[s]he was going to get a restraining order" against Hill. *Id.* at 142.  And the night of the killing,

18  Martin called Jones, and Jones could hear Hill saying hurtful things to Martin. *Id.* at 147-48.

19      Before cross-examination, Hill's trial counsel informed the trial judge that Jones had a

20  "felony conviction for theft involv[ing] the embezzlement of $75,000 from La Fiesta

21  Apartments" and requested that he be able to bring that fact out due to Jones "open[ing] the

22  door" during her direct examination. ECF No. 27-5 at 5.  The judge refused Hill's trial counsel's

23  request, directing him to limit his questions to whether she had a felony conviction and what the

1  conviction was for. *Id.* at 6.  The judge indicated that Hill's trial counsel "can't go into the

2  details." *Id.* at 6-7.

3         Later, during cross-examination, Hill's trial counsel asked Jones if she was an ex-felon, if

4  she had "a felony from 2005 for theft," if she was "a trusted employee of La Fiesta," and if she

5  "also ha[d] a felony out of California for concealing a child in violation of a court order." ECF

6  No. 27-5 at 15-16.  Hill's trial counsel then requested a bench conference where he asked if he

7  could "ask her about the La Fiesta." *Id.* at 16.  The judge refused, stating "you opened up the

8  door to ask her questions that I said you couldn't ask her, and whether she's a trusted employee

9  really isn't relevant to these proceedings." *Id.* at 17.

10        Questioning Jones about the details of her theft conviction likely would have further

11  impeached her.  However, it cannot be concluded that Hill's constitutional rights were violated

12  by the trial judge's denial of his request to bring forth this information.  The judge determined

13  that Nevada law did not entitle Hill to further question Jones. *See* Nev. Rev. Stat. § 50.095(1)

14  (providing that "[f]or the purpose of attacking the credibility of a witness, evidence that the

15  witness has been convicted of a crime is admissible").  The Supreme Court of Nevada, the final

16  arbiter of Nevada law, affirmed Hill's convictions, determining that the trial judge did not abuse

17  its discretion.  Because the trial judge determined that the details of Jones' theft conviction were

18  not admissible under Nev. Rev. Stat. § 50.095(1), this constitutes a valid state justification for

19  disallowing further questioning of Jones about her conviction. *See Crane*, 476 U.S. 690-91.  It

20  thus cannot be concluded that Hill's right to present a complete defense, right to due process, and

21  right to a fair trial were violated. *Chambers*, 410 U.S. at 294; *Trombetta*, 467 U.S. at 485.

22  Moreover, Hill's trial counsel was able to sufficiently impeach Jones with the conviction itself.

23  *See Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992) (explaining that "[a] trial court does

13

not abuse its discretion [to determine whether evidence was relevant and its prejudicial effect] so long as the jury has 'sufficient information' upon which to assess the credibility of witnesses"). Fairminded jurists would agree that this reasoning establishes that Hill's federal constitutional rights were not violated. *Harrington*, 562 U.S. at 102.  Hill is not entitled to relief on Ground 3(a).

### 3.    Ground 3(c)

In Ground 3(c), Hill alleges that the trial judge improperly limited voir dire by obstructing his relevant inquiry into the jurors' views of the differences between killing and murder. ECF No. 21 at 18.  Hill argues that this undermined his ability to present his defense that he was not guilty of first-degree murder and prevented his trial counsel from ensuring that he was tried by an impartial jury that would consider lesser-included offenses. ECF No. 53 at 16-17. In affirming Hill's judgment of conviction, the Supreme Court of Nevada held: "Hill contends that the district court abused its discretion in . . . limiting attempts to inform potential jurors about the law and the defense theory during voir dire . . . . We have reviewed th[is] argument[ ] and conclude that [it] lack[s] merit." ECF No. 28-3 at 4 n.3.

During Hill's trial counsel's questioning of a prospective juror, he stated, "[n]ow, in this case, Robin Martin was found dead, and in this case the defense is not disputing that Mr. Hill was responsible for that.  Can you think of some reasons why we're going to trial?" ECF No. 25-10 at 210.  The State requested a bench conference following this question. *Id.*  The trial judge indicated that Hill's trial counsel's line of questioning was inappropriate, explaining that "the only issue is whether they can be fair and impartial." *Id.* at 210-11.  Hill's trial counsel defended his question, stating, "I'd like to know whether or not this jury can be fair and impartial as it relates to lesser - - if this jury cannot consider lesser included crimes, I don't - - I will not be sure

that I'd have a fair and impartial jury." *Id.* at 211.  The judge disagreed, reasoning that Hill's trial

counsel is "basically instructing them on the law," which is inappropriate during voir dire,

especially since the judge had already "asked every juror if they can follow the law, and they've

all said yes." *Id.* at 211-13.

    "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire

to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  Indeed, "[w]ithout

an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be

able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."

*Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *see also Darbin v. Nourse*, 664 F.2d

1109, 1113-14 (9th Cir. 1981) (explaining that "[t]he principal purpose of voir dire is to probe

each prospective juror's state of mind to enable the trial judge to determine actual bias and to

allow counsel to assess suspected bias or prejudice.  Thus, a voir dire examination must be

conducted in a manner that allows the parties to effectively and intelligently exercise their right

to peremptory challenges and challenges for cause").

    Hill fails to demonstrate that the trial judge's refusal to allow his trial counsel to ask the

jury about their knowledge of lesser-included crimes violated his right to an impartial jury or his

right to present a complete defense.  First, it is unclear how asking the jury why it believed Hill

was going to trial or about the law on lesser-included crimes allowed him to "identify

unqualified jurors." *Morgan*, 504 U.S. at 729.  Instead, as the trial judge reasonably noted, the

jurors already stated that they would follow the law given to them (*see* ECF No. 25-10 at 57),

which would include the law on lesser-included offenses.  Therefore, as the judge aptly

determined, Hill's trial counsel was merely "arguing the case" (ECF No. 25-10 at 213) with this

line of questioning—not delving into impartiality.  Second, Hill's trial counsel was able to

1  present and argue his defense during the presentation of evidence and closing arguments, such

2  that limiting the arguing of that defense during voir dire did not hamper his "meaningful

3  opportunity to present a complete defense." *Trombetta*, 467 U.S. at 485.  Fairminded jurists

4  would agree that this reasoning establishes that Hill's federal constitutional rights were not

5  violated. *Harrington*, 562 U.S. at 102.  Hill is not entitled to relief on Ground 3(c).

6      **C.**    **Ground 4**

7          In Ground 4, Hill alleges that his federal constitutional rights were violated when the

8  State failed to present sufficient evidence that he acted with premeditation, deliberation, and

9  willfulness to convict him of first-degree murder. ECF No. 21 at 18-19.  Hill also alleges that the

10  State failed to prove that he did not act in self-defense. *Id.* at 20.  In affirming Hill's judgment of

11  conviction, the Supreme Court of Nevada held: "Hill contends that . . . the State failed to present

12  sufficient evidence to prove that the killing was willful, deliberate, and premeditated and not the

13  result of self-defense . . . . We have reviewed th[is] argument[ ] and conclude that [it] lack[s]

14  merit." ECF No. 28-3 at 4 n.3.

15          "[T]he Due Process Clause protects the accused against conviction except upon proof

16  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

17  charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A federal habeas petitioner "faces a heavy

18  burden when challenging the sufficiency of the evidence used to obtain a state conviction on

19  federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  On direct

20  review of a sufficiency of the evidence claim, a state court must determine whether "any rational

21  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

22  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The evidence is to be viewed "in the light most

23  favorable to the prosecution." *See id*.  Federal habeas relief is available only if the state-court

1 | determination that the evidence was sufficient to support a conviction was an "objectively

2 | unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

3 | **1.    Relevant evidence**

4 | Dr. Alane Olson, the medical examiner, testified that she conducted an autopsy of Martin

5 | and determined that Martin "died as a result of strangulation" and that her "manner of death

6 | [was] homicide." ECF No. 26-1 at 68, 88.  Dr. Olson explained that someone being strangled

7 | would "lose consciousness within 10 to 15 seconds," and that, "[i]n [her] opinion, the blood flow

8 | would need to be impeded for a period of three to four minutes to cause death." *Id.* at 91, 94.

9 | John Gross lived in the apartment directly below Martin and Hill and worked with Hill.

10 | ECF No. 26-1 at 107-08.  While carpooling to work with Gross, Hill would sometimes call

11 | Martin a bitch, and about a month before Martin's death, Hill indicated that "he had met

12 | someone" and had "a new flame in his life." *Id.* at 114, 116.  On December 10, 2005, Hill came

13 | to Gross' residence "because [Martin] had changed the locks" on their apartment, and Hill was

14 | "[p]retty upset." *Id.* at 117.  Later that day, Gross heard "[s]omebody trying to break the door

15 | down" of Hill and Martin's apartment. *Id.* at 118.  The next evening, December 11, 2005, Gross

16 | heard an argument between Hill and Martin "when the police officers let him back into the

17 | apartment." *Id.* at 119.  And later that night around 1:00 or 1:30 a.m. on December 12, 2005,

18 | Gross heard a bang that sounded "like the roof was going to come in." *Id.* at 120-21.  Gross then

19 | heard what "sounded like running, somebody running, and then it sounded like a [female] scream

20 | and then [he] heard Mr. Hill says: Fuck, and then it got kind of quiet and then more running." *Id.*

21 | at 122-23.  Gross then heard one more bang. *Id.* at 123.

22 | Julianna Gross, John Gross' wife, testified that she was friends with Martin and was

23 | aware that Martin and Hill were experiencing some problems around December 9, 2005, a few

1   days before her death. ECF No. 26-1 at 145-46.  Julianna told Martin that "if she had any

2   problems and, for some reason she couldn't get to her telephone, that she . . . could stomp on her

3   floor" and Julianna would call 9-1-1. *Id.* at 146, 150.  In the early morning hours of December

4   12, 2005, Julianna was woken up to yelling and "a lot of loud movements." *Id.* at 151.  Julianna

5   heard Hill yelling at Martin, but she did not hear Martin yelling at Hill. *Id.* at 154.  Julianna

6   called 9-1-1. *Id.* at 151.  The police eventually arrived, and everything got quiet again. *Id.* at 155.

7   Then after falling back to sleep for a bit, Julianna heard "[t]he noise start[ing] up again" and "a

8   female's voice screaming." *Id.*  After the scream, Julianna heard "a really loud bang." *Id.*

9   Julianna called 9-1-1 again. *Id.* at 156.  When the police arrived, they knocked on Hill and

10  Martin's apartment door for "probably like 10 - - 15 minutes." *Id.* at 158.  During that time,

11  Julianna heard movement, which "sounded like something [big] was being dragged." *Id.*

12          Patrol Officer Brandon Shatraw was dispatched to Hill and Martin's apartment following

13  Julianna's first telephone call to 9-1-1. ECF No. 26-1 at 187.  Officer Shatraw spoke with Martin

14  in the front of the apartment while his partner Officer Nunez spoke with Hill at the back of the

15  apartment. *Id.* at 193.  Officer Shatraw described Martin as being calm and folding laundry for

16  the entirety of his visit, and following his conversation with Martin, Officer Shatraw determined

17  that "there had been no battery occurring." *Id.* at 193-94, 199.  Because there was no battery,

18  "both the individuals had agreed to separate from each other for the evening by staying in

19  separate rooms." *Id.* at 196.  Officer Shatraw described Hill as being "a bit agitated, upset at the

20  whole situation." *Id.* at 199.  Approximately 30 minutes later, Officer Shatraw went back to Hill

21  and Martin's apartment following Julianna's second 9-1-1 call. *Id.* at 200-201.  When Officer

22  Shatraw arrived, another officer was knocking on Hill and Martin's apartment door, so he went

23  down to the Gross' apartment to see if he could hear anything. *Id.* at 202-03.  Officer Shatraw

heard what "sounded like footsteps, walking, and then something being moved across the floor." *Id.* at 203.  After Hill opened the door, Officer Shatraw entered the apartment and saw that "[t]he coffee table was flipped over upside door and [was] broken. [The c]ouch was flipped up and tilted sideways and there was a spot of red substance, [which he] believe[d] to be blood, on the floor." *Id.* at 206.  Martin was found in the back bedroom laying on the floor without a pulse and not breathing. *Id.* at 208-209.

Patrol Officer Daniel Nunez testified that during his discussion with Hill following the first 9-1-1 call, Hill "told [him] he had been involved in a fight with the female that was in the apartment. That she had come into the room and that she had punched him in the mouth while he was sleeping." ECF No. 26-2 at 10.  Because Hill did not have any apparent injuries and was "wearing normal causal clothes" such that "[i]t didn't appear that he had been sleeping," Officer Nunez "asked him again what happened." *Id.*  During this conversation Hill "was a little bit excited. . . . His voice was elevated, wasn't necessarily screaming, but he was talking fast and kind of moving around a little bit." *Id.* at 11.  Hill then "changed his story. Stated he had been in an argument with a female roommate over her doing laundry - - over her keeping him up. It was late at night. He was trying to get to bed." *Id.* at 12.  Recanting his previous story, Hill indicated that their altercation was only verbal. *Id.*

Officer Michael Passarge was dispatched to Hill and Martin's apartment following Julianna's second 9-1-1 call. ECF No. 26-2 at 30.  Officer Passarge approached the apartment with Officer Nicol, who knocked on the door. *Id.* at 34.  After knocking with his knuckles for a minute or two with no answer, Officer Nicol "used his baton" to knock. *Id.* at 35.  During this time, Officer Passarge went down to the Grosses' apartment and could hear "something being moved" in Hill and Martin's apartment. *Id.* at 39.  Officer Passarge went back upstairs, and Hill

1  opened the door after "15, 20 minutes" of knocking. *Id.* at 40.  Similarly, Officer Nicol testified

2  that he knocked on Hill and Martin's apartment door for 19 minutes before Hill opened the door.

3  *Id.* at 56.

4          Officer Lance Royal took Hill into custody on December 12, 2005. ECF No. 26-2 at 85.

5  Officer Royal took Hill to his patrol car and eventually transported him to the Clark County

6  Detention Center and then later to the University Medical Center. *Id.* at 87-89, 93.  During that

7  time, Hill made several "unsolicited statements." *Id.* at 89.  First, Hill stated, "[f]ucking bitch

8  come at me with a knife; I take her ass out." *Id.* at 92.  Then Hill later said, "[s]he made me

9  snap," and "I can't believe I just did what I did." *Id.* at 93.  Officer Scott Wildermuth also heard

10 Hill make some unsolicited statements. *Id.* at 110.  First, Hill said, "going to come attack me

11 while I'm trying to fucking sleep." *Id.*  Hill then said, "I'll plead temporary insanity for what I

12 did. That was some fucked up shit." *Id.* at 111.  Finally, Hill said, "I just snapped like that," and

13 "I choked her ass out; I hope she died." *Id.*  Detective Tod Williams also testified that he heard

14 Hill state, "I choked her ass out; I hope she died." ECF No. 27-5 at 149.

15         Jones, who was discussed in Ground 3(b), testified that Martin "never even raised her

16 voice. She was not that type of person. She was really always calm, cool, and just easy going

17 about everything." ECF No. 26-2 at 137.  Jones never saw Martin be physically confrontational

18 with anyone. *Id.* at 138.  Martin had indicated to Jones that she "was going to get a restraining

19 order" against Hill prior to her death. *Id.* at 142.  Martin called Jones prior to the police arriving

20 for the first time on December 12, 2005, and told Jones that she was "going to sleep in the living

21 room because" she was "going to get up bright and early" to file the restraining order paperwork.

22 *Id.* at 144, 147, 149.  Jones could hear Hill's voice in the background "saying some real mean

23 and hateful things." *Id.*  Specifically, Hill "called her a bitch.  He told her that he left her for a

20

real woman. . . . [W]hen she would ask him: Why are you here?  He told her because he can be and that she's going to take care of him." *Id.* at 148.  Hill also told Martin that "[h]e was going to go call the police hisself [sic] and tell them that he was in his room sleeping.  She came in and hit him in the mouth while he was sleep [sic]." *Id.* at 164-65.

### 2.    Relevant statutes

Sufficiency of the evidence claims are judged by the elements defined by state law. *Jackson*, 443 U.S. at 324 n.16.  Nevada law defines murder as "the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied." Nev. Rev. Stat. § 200.010(1). And as it relates to the facts of this case, first-degree murder is murder that is "willful, deliberate and premeditated." Nev. Rev. Stat. § 200.030(1)(a).  Willfulness is defined as "the intent to kill." *Byford v. State*, 116 Nev. 215, 236, 994 P.2d 700, 714 (2000).  Deliberation is defined as "the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action." *Id.*  And premeditation is defined as "a design, a determination to kill, distinctly formed in the mind by the time of the killing." *Id.* at 237, 994 P.2d at 714.

Regarding self-defense, Nevada law provides that:

> If a person kills another in self-defense, it must appear that:
> 1.    The danger was so urgent and pressing that, in order to save the person's own life, or to prevent the person from receiving great bodily harm, the killing of the other was absolutely necessary; and
> 2.    The person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.

Nev. Rev. Stat. § 200.200.

/ / / /

21

1          **3.      Sufficiency of the evidence**

2          To be sure, there was some evidence supporting Hill's claim that he either killed Martin

3   in self-defense or that the State lacked sufficient evidence to prove willfulness, deliberation, and

4   premeditation.  Officer Nicol testified that a steak knife was found lying underneath a dining

5   table chair. ECF No. 26-2 at 68.  And Detective Tod Williams testified that Hill had "two long

6   shallow superficial cuts on the upper left forearm" and "a scratch on the right . . . side of his

7   head," which appeared to have been caused by a fingernail. ECF No. 27-5 at 140-41.  Hill also

8   told Detective Williams that "he had done something he shouldn't have done, but it was in self-

9   defense." *Id.* at 150.  And later Hill indicated that "he had blacked out and didn't remember

10  anything." *Id.*

11         However, the Supreme Court of Nevada has held that "[c]ircumstantial evidence may be

12  considered and provide sufficient evidence to infer" willful, deliberate, and premeditated murder.

13  *Leonard v. State*, 117 Nev. 53, 75, 17 P.3d 397, 411 (2001).  Here, viewing the evidence "in the

14  light most favorable to the prosecution" (*Jackson*, 443 U.S. at 319), a rational trier of fact could

15  have found beyond a reasonable doubt that Hill did not act in self-defense and was guilty of first-

16  degree murder. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; *Jackson*, 443 U.S. at

17  319; Nev. Rev. Stat. § 200.030.  Hill had been seeing a new romantic partner, was recently angry

18  at Martin for changing the locks on the apartment, screamed at and verbally abused Martin the

19  night of the killing, appeared to be agitated when law enforcement responded to the first 9-1-1

20  call, lied to law enforcement about Martin battering him, failed to open the door for law

21  enforcement for up to 20 minutes when law enforcement responded to the second 9-1-1 call,

22  strangled Martin for several minutes after she lost consciousness, and admitted that he choked

23  her and hoped she died.  Further, there was testimony that Martin was a calm individual who

1  would never be physically confrontational and was acting calm the night of the killing.

2  Fairminded jurists would agree that there was sufficient evidence presented to support Hill's

3  conviction such that his federal constitutional rights were not violated. *Harrington*, 562 U.S. at

4  102.  Hill is not entitled to relief on Ground 4.

5  **D.    Ground 5**

6  In Ground 5, Hill alleges that his federal constitutional rights were violated due to

7  prosecutorial misconduct.[2] ECF No. 21 at 21.  Hill takes issue with the State's unsupported

8  argument that Martin may not have been dead when law enforcement arrived, the

9  mischaracterization of Olson's testimony regarding the length of time required for strangulation

10 to cause death, and inflammatory statement about enacting justice for Martin. *Id.* at 21-22.  In

11 affirming Hill's judgment of conviction, the Supreme Court of Nevada held: "Hill contends

12 that . . . the prosecutor engaged in misconduct during closing argument . . . . We have reviewed

13 th[is] argument[ ] and conclude that [it] lack[s] merit." ECF No. 28-3 at 4 n.3.

14 "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is

15 the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209,

16 219 (1982).  "The relevant question is whether the prosecutors' comments 'so infected the trial

17 with unfairness as to make the resulting conviction a denial of due process.'" *Darden v.*

18 *Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

19 (1974)); *see also Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991) ("Improprieties in closing

20 arguments can, themselves, violate due process.").  A court must analyze the remarks "in the

21 context in which they are made." *Boyde v. California*, 494 U.S. 370, 385 (1990).  The fairness of

22

23 _____

[2] Hill's claims that the State disparaged his trial counsel have been dismissed from this ground. *See* ECF Nos. 44, 45, 46.

1   a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments

2   manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and

3   (3) the weight of the evidence against the accused." *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th

4   Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and

5   injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104,

6   1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

### 1.   Alleged unsupported statement regarding the time of death

8        The prosecutor made the following comment during closing argument: "The evidence

9   suggests, ladies and gentlemen, that she may not have even been dead when the police got there.

10  And if she was; she hadn't been dead for long.  So then you have to ask yourselves the question:

11  What, on God's green earth is he doing for 19 minutes?" ECF No. 27-7 at 74.

12       The comment that Martin may not have been dead when law enforcement first arrived

13  was based—if only lightly—on facts that were presented at the trial.  Indeed, numerous

14  witnesses testified that law enforcement knocked on the front door of Hill and Martin's

15  apartment for a long time before Hill opened the door: Julianna Gross testified that the knocking

16  lasted 10 to 15 minutes, Officer Passarge testified that the knocking lasted 15 to 20 minutes, and

17  Officer Nicol testified that the knocking lasted 19 minutes. ECF No. 26-1 at 158; ECF No. 26-2

18  at 40, 56.  During this time, witnesses could hear something large being moved around Hill and

19  Martin's apartment. ECF No. 26-1 at 158, 203; ECF No. 26-2 at 39.  Thus, due to the length of

20  time it took for Hill to open the door after law enforcement arrived, the comment that Martin

21  *may* not have been dead when law enforcement first arrived is supported by the evidence and, as

22  such, did not render Hill's trial unfair. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000)

23  (concluding that the State's improper closing argument did not infect the trial with unfairness

because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence").

### 2.    Alleged mischaracterization of testimony

During closing argument, the prosecutor said: "when Dr. Olson was given the opportunity to answer why it was fraught with controversy, she said: Yeah, a lot of people in my profession say it takes longer for [sic] five minutes for someone to die." ECF No. 27-7 at 83. This comment appears to be somewhat of an exaggeration. During her redirect examination, when asked whether strangulation "has to be 3 to 4 minutes . . . uninterrupted . . . to cause death," Dr. Olson testified that while it was her opinion "it's most likely between 3 and 4 minutes," it is possible that it can take more or less time than that. ECF No. 26-1 at 63-64, 102. The prosecutor then asked Dr. Olson if she had "reviewed studies of other people in [her] field that say: It could be a lot more than 3 to 4 minutes?" *Id.* at 104-05. Dr. Olson answered in the affirmative. *Id.* at 105.

It appears that the prosecutor inflated Dr. Olson's testimony. Stating that "a lot of people" believe it takes longer than five minutes for someone to die from strangulation stretches the original testimony that "other people . . . say . . . [i]t could be a lot more than 3 to 4 minutes." *Compare* ECF No. 27-7 at 83 *with* ECF No. 26-1 at 104-05. However, even if the prosecutor may have misstated the evidence, it cannot be determined that this comment "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-38. Indeed, there was significant evidence of Hill's guilt, which is discussed in Ground 4, especially his statement to law enforcement that he choked Martin and hoped she died. And the jury was instructed that "[s]tatements, arguments and opinions of counsel are not evidence in the case." ECF No. 27-8 at 29. This instruction supports the conclusion that any misconduct did not

1  amount to a due process violation. *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005)

2  (finding that prosecutorial misconduct did not amount to a due process violation where the trial

3  court gave an instruction that the attorneys' statements were not evidence and where the

4  prosecutors presented substantial evidence of the defendant's guilt).

5          **3.**      **Alleged inflammatory statement**

6      During closing argument, the prosecutor made the following comment:

7          Robin Martin's probably dead, or Robin Martin's in the last minute
of her life when that clock stops.  The last thing the Judge told you

8          is that when you go back and deliberate, your sole, fixed, and
steadfast purpose must be to do equal and exact justice, not only

9          between this Defendant but between the State of Nevada, and that
doesn't just mean the prosecutors at this table.  That means Robin

10          Martin's family and it means Robin Martin.

11  ECF No. 27-7 at 85.

12      Prosecutors have been "consistently cautioned against [making] prosecutorial statements

13  designed to appeal to the passions, fears and vulnerabilities of the jury." *See United States v.*

14  *Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005); *see also United States v. Nobari*, 574 F.3d

15  1065, 1077 (9th Cir. 2009) (finding that "[t]he prosecution's comment was an improper appeal to

16  jurors' emotions and fears").  Although this comment may have come close to crossing into

17  improper territory, it cannot be determined that this single comment "so infected the trial with

18  unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at

19  181.  Fairminded jurists would agree that Hill's federal constitutional rights were not violated by

20  the foregoing comments made by the prosecutor. *Harrington*, 562 U.S. at 102.  Hill is not

21  entitled to relief on Ground 5.

22  / / / /

23  / / / /

### E.    Ground 6

In Ground 6, Hill alleges that his federal constitutional rights were violated when the trial judge rejected two defense jury instructions.[3] ECF No. 21 at 26.  In affirming Hill's judgment of conviction, the Supreme Court of Nevada held: "Hill contends that the district court abused its discretion in . . . rejecting his proffered jury instructions . . . . We have reviewed th[is] argument[] and conclude that [it] lack[s] merit." ECF No. 28-3 at 4 n.3.

The heart of Hill's argument is that the trial judge prevented him from establishing his defense theory by denying his proposed instructions. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *see also Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002) ("[T]he state court's failure to correctly instruct the jury on the defense may deprive the defendant of his due process right to a present a defense.").  "[A] claim that a court violated a petitioner's due process rights by omitting an instruction requires a showing that the error 'so infected the entire trial that the resulting conviction violate[d] due process.'" *Menendez v. Terhune*, 422 F.3d 1012, 1029 (2005) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

Hill's proposed jury instructions provided: "There is no rule of law dictating that all deaths by strangulation are First Degree Murder or Second Degree Murder or Voluntary Manslaughter" and "Express malice cannot exist if you find the Defendant's actions were the result of an irresistible passion." ECF No. 27-6 at 2-3.  The trial judge rejected the first proposed instruction because she did not "think this is a correct statement of the law." ECF No.

---

[3] Hill also alleges that Jury Instructions Nos. 10 and 15 misstated the jury's legal obligation by improperly minimizing the State's burden of proof. ECF No. 21 at 26.  This argument will be discussed in Ground 7(d).

1  27-7 at 20.  And the judge rejected the second proposed instruction because it "was

2  duplicative." *Id.* at 21.

3       Hill fails to cite any authority supporting the first proposed jury instruction.  And the trial

4  judge accurately instructed the jury about malice[4] such that the second proposed jury instruction

5  was unnecessary.  Thus, Hill fails to demonstrate that the failure to give his proposed instructions

6  "so infected the entire trial that [his] resulting conviction violate[d] due process." *Henderson*,

7  431 U.S. at 154; *see also Menendez*, 422 F.3d at 1029 ("'Failure to give [a jury] instruction

8  which might be proper as a matter of state law,' by itself, does not merit federal habeas relief"

9  (quoting *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir. 1985))).  Fairminded jurists would agree

10 that Hill's federal constitutional rights were not violated. *Harrington*, 562 U.S. at 102.  Hill is

11 not entitled to relief on Ground 6.

12 **F.       Ground 7**

13      In Ground 7, Hill alleges that his federal constitutional rights were violated due to his

14 trial counsel's ineffectiveness. ECF No. 21 at 27.  In *Strickland*, the Supreme Court propounded

15 a two-prong test for analyzing claims of ineffective assistance of counsel, requiring the petitioner

16 to demonstrate (1) that the attorney's "representation fell below an objective standard of

17 reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such

18 that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

19 the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694

20

21 _____

[4] The jury was instructed that "[m]alice aforethought means the intentional doing of a wrongful

22 act without legal cause or excuse or what the law considers adequate provocation." ECF No. 27-
   8 at 7.  The jury was also instructed that "[e]xpress malice is that deliberate intention unlawfully

23 to take away the life of a human being," and "[m]alice may be implied when no considerable
   provocation appears, or when all the circumstances of the killing show an abandoned and
   malignant heart." *Id.* at 8.

28

1   (1984).  A court considering a claim of ineffective assistance of counsel must apply a "strong

2   presumption that counsel's conduct falls within the wide range of reasonable professional

3   assistance." *Id.* at 689.  The petitioner's burden is to show "that counsel made errors so serious

4   that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

5   Amendment." *Id.* at 687.  Additionally, to establish prejudice under *Strickland*, it is not enough

6   for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of

7   the proceeding." *Id.* at 693.  Rather, the errors must be "so serious as to deprive the defendant of

8   a fair trial, a trial whose result is reliable." *Id.* at 687.

9          Where a state district court previously adjudicated the claim of ineffective assistance of

10  counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult.

11  *See Harrington*, 562 U.S. at 104–05.  In *Harrington*, the Supreme Court of the United States

12  clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in

13  tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th

14  Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's

15  *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards

16  apply; hence, the Supreme Court's description of the standard as doubly deferential.").  The

17  Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether

18  counsel's actions were reasonable. The question is whether there is any reasonable argument that

19  counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

20              **1.      Ground 7(a)**

21          In Ground 7(a), Hill alleges that his trial counsel failed to adequately prepare for an

22  effective cross-examination of Dr. Olson. ECF No. 21 at 28.  Hill elaborates that Dr. Olson

23  changed her testimony regarding the length of time it takes to strangle a person from the

1   preliminary hearing in 2006 to the second trial in 2009, but his trial counsel failed to timely

2   obtain information about the seminar—specifically a pamphlet—that prompted Dr. Olson to

3   make this change. *Id.* at 28-29.  In affirming the denial of Hill's state habeas petition, the

4   Supreme Court of Nevada held:

> Hill contends that trial counsel should have cross-examined the
> medical examiner about a pamphlet from a seminar she attended,
> after which she changed her opinion regarding the length of time it
> takes to die from strangulation.  Hill failed to demonstrate deficient
> performance considering the medical examiner's testimony that her
> opinion was based on information she learned at the seminar and
> other research, not the information included in the pamphlet.  Hill
> also failed to demonstrate prejudice considering the medical
> examiner's testimony that there was not a clear consensus in the
> medical community regarding how long it takes to die from
> strangulation and that she could not determine how long the victim
> was strangled in this case.  Although Hill asserts that counsel should
> have presented expert testimony to demonstrate the lack of
> consensus, he does not identify an expert who counsel should have
> retained or describe the testimony such an expert would have given
> that would not have been cumulative of the medical examiner's
> testimony about the lack of consensus. *See Hargrove*, 100 Nev. at
> 502, 686 P.2d at 225 (observing that no relief was warranted where
> the claim "was not accompanied by the witness' names or
> descriptions of their intended testimony"); *Elam v. Denney*, 662
> F.3d 1059, 1067 (8th Cir. 2011) (observing that "failure to present
> cumulative evidence does not constitute ineffective assistance of
> counsel").  We therefore conclude that Hill has not demonstrated
> that the district court erred by denying this claim.

18   ECF No. 28-9 at 3.  The Supreme Court of Nevada's rejection of Hill's claim was neither

19   contrary to nor an unreasonable application of clearly established law as determined by the

20   Supreme Court of the United States and was not based on an unreasonable determination of the

21   facts.

22         At a preliminary hearing held on December 28, 2005, Dr. Olson testified that

23   "[a]pproximately 60 seconds to 120 seconds" of "continued pressure [would be needed] to

interrupt the blood flow to the brain . . . in order to kill someone." ECF No. 22-2 at 4.  Four years

later, at Hill's second trial in June 2009, Dr. Olson testified again about the time required to

strangle someone, testifying on direct examination that "[i]n [her] opinion, the blood flow would

need to be impeded for a period of three to four minutes to cause death." ECF No. 26-1 at 94.

Dr. Olson then explained, "I have looked at the available literature and published texts and I will

say that there is disagreement among those sources as to how long it takes to strangle someone to

death." *Id.*

Hill's trial counsel then cross-examined Dr. Olson about the time required to strangle

someone to death.  First, Hill's trial counsel asked Dr. Olson if it was "fair to say that [the time it

takes to strangle someone to death] is an issue fraught with controversy?" *Id.* at 99.  Dr. Olson

responded in the affirmative. *Id.*  Second, Hill's trial counsel asked, "You can't sit here today

and tell us that there was constant pressure of two, three, or even four minutes that caused the

death of Robin Martin; can you?  You can't give us a number?" *Id.* at 100.  Dr. Olson responded

in the negative. *Id.*  Third, Hill's trial counsel asked whether "there's also subjective physical

factors that may have a lot to do with how long it would take a person to be killed by

strangulation?" *Id.* at 101.  Dr. Olson indicated "that's also possible." *Id.*  Finally, Hill's trial

counsel asked Dr. Olson whether she testified at the preliminary hearing that it only takes "60

seconds to 120 seconds" to strangle someone, and Dr. Olson responded in the affirmative. *Id.*

During redirect examination, the prosecutor asked Dr. Olson about the basis for her

change in opinion regarding the time it takes to strangle someone to death. *Id.* at 103-105.  Dr.

Olson testified that the change was the result of a continuing medical education seminar that was

put on by the American Academy of Forensic Science. *Id.* at 103.  Then, during recross-

1  examination, Hill's trial counsel asked whether that continuing medical education seminar "had

2  to do with hanging deaths," to which Dr. Olson responded that it did. *Id.* at 105.

3      The Supreme Court of Nevada reasonably concluded that Hill failed to demonstrate that

4  his trial counsel acted deficiently in his cross-examination of Dr. Olson. *Strickland*, 466 U.S. at

5  688.  Importantly, because Hill's trial counsel was able to highlight several issues with Dr.

6  Olson's opinion regarding the time required to strangle someone to death, it cannot be concluded

7  that his "representation fell below an objective standard of reasonableness." *Id.*; *see also Dows v.*

8  *Wood*, 211 F.3d 480, 487 (9th Cir. 2000) ("[C]ounsel's tactical decisions at trial, such as

9  refraining from cross-examining a particular witness or from asking a particular line of

10  questions, are given great deference and must similarly meet only objectively reasonable

11  standards.").  Indeed, Hill's trial counsel questioned Dr. Olson about her change in testimony,

12  the disagreement that exists among professionals about the time required to strangle someone to

13  death, and the fact that the seminar that changed her opinion was about hanging deaths, not

14  strangulation deaths.  Moreover, because Dr. Olson changed her opinion based on the seminar

15  itself, as the Supreme Court of Nevada reasonably noted, it is unclear how the information in a

16  pamphlet would have been beneficial to Hill's defense.  Therefore, because the Supreme Court

17  of Nevada reasonably denied Hill's ineffective-assistance-of-counsel claim, Hill is not entitled to

18  federal habeas relief for Ground 7(a).

19          **2.      Ground 7(b)**

20      In Ground 7(b), Hill alleges that his trial counsel failed to object to Jones' testimony.

21  ECF No. 21 at 29.  He elaborates that his trial counsel should have objected when Jones testified

22  that Martin told her that she intended to obtain a protective order against Hill because this

23  testimony was hearsay, was more prejudicial than probative, and amounted to prior "bad act"

evidence. *Id.* at 29-30.  In affirming the denial of Hill's state habeas petition, the Supreme Court of Nevada held:

> Hill contends that trial counsel should have objected to testimony from the victim's sister that the victim intended to obtain a protective order.  Hill failed to demonstrate deficient performance as the sister's testimony, when considered in context, does not explicitly or implicitly reference an otherwise inadmissible bad act and therefore an objection would not have been successful on this basis. *See Ennis v. State*, 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006) ("Trial counsel need not lodge futile objections to avoid ineffective assistance of counsel claims.").  Hill also failed to demonstrate prejudice as the victim's intent to obtain a protective order was elicited from other witnesses whose testimony he does not challenge.  Moreover, he does not contend that the result of trial would have been different had counsel objected to the victim's sister's testimony.  We therefore conclude that Hill has not demonstrated that the district court erred by denying this claim.

ECF No. 28-9 at 4.  The Supreme Court of Nevada's rejection of Hill's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States and was not based on an unreasonable determination of the facts.

As was discussed in Ground 3(b), the State called Jones as a witness. ECF No. 26-2 at 120-21.  Jones testified that the day before she was killed, Martin told her that "[s]he was going to get a restraining order" against Hill. *Id.* at 142.  Jones then discussed "what [Martin] would need to do to get" a restraining order. *Id.*  That night, in the early morning hours of December 12, 2005 before she was killed, Martin called Jones to tell her that "[s]he was going to go get a restraining order early the next morning." *Id.* at 144, 146.  Hill's trial counsel did not object to this testimony. *See id.* at 142, 146.

Even if Hill's trial counsel was deficient for not objecting to Jones' testimony about Martin wanting to obtain a restraining order against Hill, the Supreme Court of Nevada

1  reasonably determined that Hill fails to demonstrate prejudice. *Strickland*, 466 U.S. at 694.  As

2  the Supreme Court of Nevada reasonably noted, testimony that Martin intended to get a

3  restraining order against Hill had already been introduced at trial.  Officer Shatraw testified that

4  he responded to Martin's apartment in the early morning hours of December 12, 2005 and spoke

5  with Martin about her altercation with Hill. ECF No. 26-1 at 192-96.  Officer Shatraw told

6  Martin that her options to remove Hill from her apartment "were to either have him evicted

7  through the Constable's Office or follow-up through Family Court for a restraining order." *Id.* at

8  197.  And Officer Shatraw testified that Martin was already aware of these options: "[s]he knew

9  the address, where to go to get a restraining order and . . . she was quite familiar with the

10  process." *Id.* at 198.  Martin indicated that it was her intent to get a restraining order against Hill

11  in the morning. *Id.*  Because the jury was already aware of the restraining order issue, Hill fails

12  to demonstrate that the result of his trial would have been different had his trial counsel objected

13  to Jones' restraining order testimony.  As such, the Supreme Court of Nevada reasonably denied

14  this claim, and Hill is denied federal habeas relief for Ground 7(b).

15              **3.      Ground 7(c)**

16          In Ground 7(c), Hill alleges that his trial counsel implicitly admitted guilt to the jury

17  during voir dire. ECF No. 21 at 30.  In affirming the denial of Hill's state habeas petition, the

18  Supreme Court of Nevada held:

19              Hill contends that trial counsel implicitly admitted his guilt during
             voir dire.  Hill failed to demonstrate deficient performance because

20              counsel merely acknowledged that Hill caused the victim's death,
             which was not in dispute and was consistent with his theories of

21              defense (that he acted without premeditation or deliberation, in the
             heat of passion, or in self-defense). *See Armenta-Carpio v. State*,

22              129 Nev. 531, 306 P.3d 396 (2013) (recognizing that concession as
             to some elements may be a reasonable trial strategy depending on

23              circumstances of case).  We therefore conclude that Hill has not
             demonstrated that the district court erred by denying this claim.

34

1   ECF No. 28-9 at 4-5.  The Supreme Court of Nevada's rejection of Hill's claim was neither

2   contrary to nor an unreasonable application of clearly established law as determined by the

3   Supreme Court of the United States and was not based on an unreasonable determination of the

4   facts.

5          As was discussed in Ground 3(c), during questioning of a prospective juror Hill's trial

6   counsel stated, "[n]ow, in this case, Robin Martin was found dead, and in this case the defense is

7   not disputing that Mr. Hill was responsible for that.  Can you think of some reasons why we're

8   going to trial?" ECF No. 25-10 at 210.  The Supreme Court of Nevada reasonably determined

9   that this comment did not amount to a deficiency on the part of Hill's trial counsel.  As the

10  Supreme Court of Nevada reasonably discussed, this comment simply recognized that Hill was

11  not disputing the cause of Martin's death—it did not concede guilt.  In fact, prior to voir dire,

12  after Hill's trial counsel introduced himself, his co-counsel, and Hill, Hill's trial counsel

13  explained that "Robin Martin was found dead on December 12th, 2005, and we do not dispute

14  the fact that she was killed by Leonard Hill." ECF No. 25-11 at 10.  Rather, Hill's trial counsel

15  explained, "[w]e dispute the charge of murder." *Id.*  As such, as the Supreme Court of Nevada

16  reasonable noted, this disputed comment aligned with Hill's theory of defense that he killed

17  Martin in a heat of passion or, alternatively, in self-defense. *See* ECF No. 26-1 at 40-41, 47

18  (opening statements by Hill's trial counsel that "[p]eople act out of . . . passion and that's what

19  this case is all about" and "Robin Martin comes at Leonard Hill with a knife").  Because the

20  Supreme Court of Nevada reasonably denied this claim, Hill is denied federal habeas relief for

21  Ground 7(c).

22  / / / /

23  / / / /

4.      **Ground 7(d)**

In Ground 7(d), Hill alleges that his trial counsel failed to object Jury Instructions Nos. 10 and 15, which minimized the State's burden of proof by improperly advising the jury that it could convict him of second-degree murder or manslaughter only if it had a reasonable doubt about the greater offense of first-degree murder. ECF No. 21 at 31.  In affirming the denial of Hill's state habeas petition, the Supreme Court of Nevada held:

> Hill contends that trial counsel should have objected to instructions that he claims informed jurors they could not consider a lesser-included offense unless "some" of them were not convinced of his guilt beyond a reasonable doubt.  Hill failed to demonstrate deficient performance or prejudice because the identified instructions (10 and 15) are consistent with Nevada law as established in *Green v. State*, 119 Nev. 542, 80 P.3d 93 (2003).  We therefore conclude that Hill has not demonstrated that the district court erred by denying this claim.

ECF No. 28-9 at 5-6.  The Supreme Court of Nevada's rejection of Hill's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the Supreme Court of the United States and was not based on an unreasonable determination of the facts.

Jury Instruction No. 10 provided:

> You are instructed that if you find that the State has established that the defendant has committed first degree murder you shall select first degree murder as your verdict. The crime of first degree murder includes the crime of second degree murder. You may find the defendant guilty of second degree murder if:
> 1.      You have not found, beyond a reasonable doubt, that the defendant is guilty of murder of the first degree, and
> 2.      All twelve of you are convinced beyond a reasonable doubt the defendant is guilty of the crime of second degree murder.
> If you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant, but you have a reasonable doubt whether such murder was of the first or of the

1            second degree, you must give the defendant the benefit of that doubt
2            and return a verdict of murder of the second degree.

3  ECF No. 27-8 at 11.  Jury Instruction No. 15 provided:

4            The crime of second degree murder includes the crime of voluntary
              manslaughter.  You may find the defendant guilty of voluntary
5            manslaughter if:
                  1.      You have not found beyond a reasonable doubt that
6                          the defendant is guilty of murder of the second
                          degree, and
7                  2.      All twelve of you are convinced beyond a reasonable
                          doubt the defendant is guilty of the crime of
8                          voluntary manslaughter.
            If you are convinced beyond a reasonable doubt that an unlawful
9            killing occurred, but you have a reasonable doubt whether the
            unlawful killing was second degree murder or voluntary
10           manslaughter, you must give the defendant the benefit of that doubt
            and return a verdict of voluntary manslaughter.

11

12  *Id.* at 16.

13        The Supreme Court of Nevada, the final arbiter of Nevada law, reasonably determined

14  that Jury Instructions Nos. 10 and 15 were proper recitations of Nevada law.  The Supreme Court

15  of Nevada has held that "when a transition instruction is warranted," meaning that the jurors

16  need guidance in their "consideration of a primary charged offense [and] the[ir] consideration of

17  a lesser-included offense," the trial judge is required to "instruct the jury that it may consider a

18  lesser-included offense if, after first fully and carefully considering the primary or charged

19  offense, it either (1) finds the defendant not guilty, or (2) is unable to agree whether to acquit or

20  convict on that charge." *Green v. State*, 119 Nev. 542, 545, 548, 80 P.3d 93, 95, 97 (2003).  Jury

21  Instruction Nos. 10 and 15 mirror the requirements of *Green*.  Jury Instruction No. 10 instructs

22  the jury that it "may find [Hill] guilty of second degree murder if . . . [y]ou have not found,

23  beyond a reasonable doubt, that [Hill] is guilty of murder of the first degree." ECF No. 27-8 at

1    11.  And Jury Instruction No. 15 instructs the jury that it "may find [Hill] guilty of voluntary

2    manslaughter if . . . [y]ou have not found beyond a reasonable doubt that [Hill] is guilty of

3    murder of the second degree." *Id.* at 16.  Because there was no basis under Nevada law to object

4    to Jury Instruction Nos. 10 and 15, the Supreme Court of Nevada reasonably concluded that Hill

5    failed to demonstrate that his trial counsel acted deficiently in not objecting to these instructions.

6    *Strickland*, 466 U.S. at 688.  Hill is denied federal habeas relief for Ground 7(d).

7              **5.      Ground 7(e)**

8              In Ground 7(e), Hill alleges that his trial counsel failed to object to four disparaging

9    comments that the prosecutor made regarding the defense.  ECF No. 21 at 32.  Hill contends that

10   these comments prejudiced him because they cast his trial counsel as being disrespectful and as

11   attempting to hide evidence.  *Id.* at 35.  In affirming the denial of Hill's state habeas petition, the

12   Supreme Court of Nevada held:

13                  Hill contends that counsel should have objected to prosecutorial
                    misconduct and raised the misconduct on appeal.  Hill failed to
14                  demonstrate deficient performance or prejudice as none of the
                    identified comments rise to the level of prejudicial misconduct.
15                  [Footnote 4: We note that the prosecutor's comment that defense
                    counsel was performing a "Columbo act" occurred outside the
16                  presence of the jury.] *See Valdez v. State*, 124 Nev. 1172, 1188, 196
                    P.3d 465, 476 (2008) (discussing instances of prosecutorial
17                  misconduct).  We therefore conclude that Hill has not demonstrated
                    that the district court erred by denying this claim.
18

19   ECF No. 28-9 at 6.  The Supreme Court of Nevada's rejection of Hill's claim was neither

20   contrary to nor an unreasonable application of clearly established law as determined by the

21   Supreme Court of the United States and was not based on an unreasonable determination of the

22   facts.

23

1    Hill first takes issue with the italicized comment the prosecutor made during its redirect

2 examination of Dr. Olson:

3        Q.              Subsequent to that, did you do additional
                         research and investigation in order to make
4                        an accurate determination about what your
                         opinion would be regarding the length of time
5                        it took to strangle someone to death?

6        [Hill's trial counsel]:  Judge, I'm going to object at this point. As of
                         right now, I've received no discovery of this
7                        issue except for a 2-page document from
                         some CME.
8
         THE COURT:      Okay.
9
         [Hill's trial counsel]:  So if there's further - - I'm - - what I'm
10                       hearing now from [the State] is there's more
                         than that and I have not received that.
11
         THE COURT:      Okay. Your objection's noted. Overruled and
12                       you - -

13       [The State]:    And the only thing I would ask - - *if I could
                         trouble the Court to ask [Hill's trial counsel]*
14                       *to properly approach the bench instead of*
                         *making speaking objections and arguments.*
15                       *He knows he shouldn't do that, Judge.*

16       THE COURT:      You may proceed.

17 ECF No. 26-1 at 103 (emphasis added).

18    Second, during his cross-examination of Julianna Gross, Hill's trial counsel asked the

19 clerk for an exhibit that the prosecutor "had . . . on direct." *Id.* at 176.  When Hill's trial counsel

20 then asked the prosecutor if it "ha[d] them in [its] possession," the prosecutor responded, "[t]he

21 one you didn't want her to see?" *Id.*

22    Third, during the redirect examination of Officer Shatraw, the prosecutor asked, "[n]ow

23 [Hill's trial counsel] was asking you a few questions about when you spoke with the homicide

39

1    detectives and . . . what you answered and what they asked of you?" *Id.* at 231.  Officer Shatraw

2    answered, "yes," and the prosecutor asked, "[a]nd you indicated that you wanted to explain your

3    answer?" *Id.*  After Officer Shatraw answered in the affirmative again, the prosecutor followed-

4    up with: "[Hill's trial counsel] didn't want to hear it.  Will you please tell the members of the

5    jury what that was." *Id.*  Hill's trial counsel objected to the question as being nonresponsive. *Id.*

6            Fourth, after the State rested, the trial judge excused the jury for a recess. ECF No. 27-5

7    at 158-59.  The judge indicated that "this hearing is taking place outside the presence of the jury

8    panel," and then discussed Hill's right to testify with him. *Id.* at 159-162.  Then, as was more

9    fully discussed in Ground 3(a), the prosecutor told the judge that it wanted Hill's trial counsel to

10   make an offer of proof regarding Detective Andersen because it did not believe Hill had any

11   basis to call her as a witness regarding the timing of her testing of the DNA evidence. *Id.* at 162-

12   63.  After Hill's trial counsel explained why he wanted to call Detective Andersen, the

13   prosecutor commented, "I mean this with all due respect, but this is kind of a Columbo act we

14   got going on here." *Id.* at 165.

15           The Supreme Court of Nevada reasonably determined that these four comments did not

16   amount to prosecutorial misconduct. *See Darden*, 477 U.S. at 181.  The first comment was a

17   simple reminder that Hill's trial counsel should have requested a bench conference in order to

18   discuss his objection.  This was not improper.  The second and third comments implied to a

19   slight degree that Hill's trial counsel was attempting to block the jury from seeing or hearing

20   specific evidence, but these comments were quick and mild.  And the fourth comment was made

21   outside the presence of the jury, resulting in no prejudice to Hill.  Accordingly, the Supreme

22   Court of Nevada reasonably concluded that Hill failed to demonstrate that his trial counsel acted

23

40

1  deficiently in not objecting to these comments.  Hill is denied federal habeas relief for Ground

2  7(e).

3  **G.    Ground 8**

4  In Ground 8, Hill alleges that his federal constitutional rights were violated due to the

5  cumulative effects of the errors at his trial. ECF No. 21 at 35.  In affirming Hill's judgment of

6  conviction, the Supreme Court of Nevada held: "Hill contends that . . . cumulative error warrants

7  reversal of the judgment of conviction . . . . We have reviewed th[is] argument[ ] and conclude

8  that [it] lack[s] merit." ECF No. 28-3 at 4 n.3.  And in affirming the denial of Hill's state habeas

9  petition, the Supreme Court of Nevada held: "Hill contends that counsel's derelictions,

10  considered cumulative, entitle him to relief.  We disagree because Hill failed to demonstrate any

11  deficiencies in counsel's performance and, therefore, there is nothing to cumulate." ECF No. 28-

12  9 at 6.  These rulings were reasonable.

13  Cumulative error applies where, "although no single trial error examined in isolation is

14  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

15  prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also*

16  *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess

17  whether the aggregated errors "'so infected the trial with unfairness as to make the resulting

18  conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

19  (1974)).  I have not identified any definite errors, so there are no errors to cumulate.  Hill is

20  denied federal habeas relief for Ground 8.[5]

21

22

23  [5] Hill requests that I "[c]onduct an evidentiary hearing at which proof may be offered concerning the allegations in [his] amended petition and any defenses that may be raised by respondents." ECF No. 21 at 37.  He fails to explain what evidence would be presented at an evidentiary hearing.  And I have already determined that Hill is not entitled to relief.  Neither further factual

1 **IV.   CERTIFICATE OF APPEALABILITY**

2       This is a final order adverse to Hill.  As such, Rule 11 of the Rules Governing Section

3 2254 Cases requires me to issue or deny a certificate of appealability (COA).  Therefore, I have

4 *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See*

5 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).  A COA may

6 issue only when the petitioner "has made a substantial showing of the denial of a constitutional

7 right." 28 U.S.C. § 2253(c)(2).  With respect to claims rejected on the merits, a petitioner "must

8 demonstrate that reasonable jurists would find the district court's assessment of the constitutional

9 claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v.*

10 *Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if

11 reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a

12 constitutional right and (2) whether the court's procedural ruling was correct. *Id*.  Applying these

13 standards, I find that a certificate of appealability is unwarranted.

14 **V.   CONCLUSION**

15       I THEREFORE ORDER that the First Amended Petition for A Writ of Habeas Corpus

16 Pursuant to 18 U.S.C. 2254 **(ECF No. 21) is DENIED**.

17       I FURTHER ORDER that the petitioner is denied a certificate of appealability.

18       I FURTHER ORDER the Clerk of the Court to enter judgment accordingly.

19       Dated: July 21, 2021.

20                                      

                       ANDREW P. GORDON

21                        UNITED STATES DISTRICT JUDGE

22  

23 development nor any evidence that may be proffered at an evidentiary hearing would affect my
reasons for denying relief.  Hill's request for an evidentiary hearing is denied.